**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **STEPHEN A. METSACK AND** | : | **CIVIL ACTION NO.** |
| **GAIL D. METSACK,** | : | **3:14-CV-01150 (VLB)** |
|    **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LIBERTY MUTUAL FIRE INSURANCE** | : | |
| **COMPANY AND ALLSTATE INSURANCE** | : | |
| **COMPANY,** | : | |
|    **Defendants.** | : | **September 30, 2015** |

**MEMORANDUM OF DECISION DENYING DEFENDANTS' MOTION TO DISMISS
THE COMPLAINT [Dkt. 14]**

**I.**    **Introduction**

The Plaintiffs, Stephen A. Metsack and Gail D. Metsack (the "Metsacks"),

bring this action against Defendants Liberty Mutual Fire Insurance Company

("Liberty Mutual"), and Allstate Insurance Company ("Allstate"), alleging breach

of contract, breach of the implied covenant of good faith and fair dealing, and

violations of the Connecticut Unfair Insurance Practices Act ("CUIPA") and Unfair

Trade Practices Act ("CUTPA"), as a result of Liberty Mutual's decision to decline

coverage for damage to the basement walls of Plaintiffs' home (the "Property")

under a homeowners insurance policy (the "Policy") issued to the plaintiffs by

Liberty Mutual.  Liberty Mutual has moved to dismiss the Complaint for failure to

state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6),

arguing that the Policy excludes coverage for the type of damage claimed by

defendants to any "foundation" or "retaining wall" and that the basement walls of

1

the Property are a "foundation" or "retaining wall" within the meaning of the Policy exclusion.  Plaintiffs argue that those terms are ambiguous as used in the Policy and therefore must be construed in favor of coverage.  For the reasons that follow, Defendant Liberty Mutual's Motion to Dismiss is DENIED.

II.   <u>Factual Background</u>

The following facts and allegations are taken from Plaintiffs' First Amended Complaint.

Defendant Liberty Mutual is an insurance company incorporated under the laws of the Commonwealth of Massachusetts and has a principal place of business in Massachusetts.  [Dkt. 30, Amend. Compl. at ¶ 2].  Defendant Allstate is an insurance company incorporated under the laws of the State of Illinois and has a principal place of business in Illinois.  [Id. ¶ 3].  The Metsacks are Connecticut residents who purchased a residential property at 148 Laurel Lane, Ashford, Connecticut in June of 1991.  [Id. ¶ 1].  The residence that is the subject of this action was constructed in 1992.  [Id. ¶ 5].  The Metsacks insured their home at 148 Laurel Lane between June of 1991 and September of 2009 with a homeowner's policy issued by Allstate.  [Id. ¶ 55].  Beginning in 2009, the Metsacks insured the Property with a homeowner's policy issued by Liberty Mutual.  [Id. ¶ 6].

In the Spring of 2014, the Metsacks noticed water in their basement and noticed a series of horizontal and vertical cracks throughout most of the basement walls of their home.  [Id. ¶¶ 8, 9].  In April of 2014, the Metsacks were

advised by their contractor, Dean Soucy, that the form of "pattern cracking" found in the basement walls of their home was due to a chemical compound found in certain basement walls constructed in the late 1980s and the early 1990s with concrete most likely from the J.J. Mottes Concrete Company. [Id. ¶ 11]. This compound "began to oxidize (rust) and expand, breaking the bonds of the concrete internally." [Id. ¶ 12]. Plaintiffs allege that "[a]t some point between the date on which the basement walls were poured and the month of April, 2014 the basement walls suffered a substantial impairment to their structural integrity." [Id. ¶ 14]. The Metsacks notified Liberty Mutual on April 15, 2014 of the condition of their basement walls and made a claim for coverage.   [Id. ¶¶ 14, 15].

Liberty Mutual's claims representative denied the Metsacks' claim for coverage in a letter dated May 12, 2014 stating that the Policy does not afford coverage for "settling/earth movement or seepage of ground water…." [Id. ¶ 19]. Plaintiffs allege that Allstate's claims representative also denied the Metsacks' claim orally on March 10, 2015, asserting that the Allstate policy does not afford coverage for losses that occur "over time" and that "too much time has passed since Allstate covered the property." [Id. ¶ 68]. Plaintiff alleges that the cost of replacing the basement walls "is expected to be not less than $125,000.00." [Id. ¶ 23].

The Liberty Mutual Policy, which is the relevant policy for the purposes of Liberty Mutual's Motion to Dismiss, is attached as an Exhibit to the First Amended Complaint and provides coverage under Section 8 of the Policy for "direct physical loss to covered property involving collapse of a building or any

3

part of a building caused only by one or more of the following:…(b) Hidden decay;… or (f) Use of defective material or methods in construction, remodeling or renovation." [Dkt. 30, Ex. A, at 5]. Section 8 also includes an exclusionary clause, which excludes coverage for appurtenances, stating that "[l]oss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, *foundation, retaining wall*, bulkhead, pier, wharf or dock is not included *unless the loss is a direct result of the collapse of a building*." [Id.] (emphasis added).

Plaintiff alleges that Liberty Mutual has "a general business practice of acting intentionally to mislead its insureds into believing that the collapse of the basement walls of a building caused by hidden decay or by the use of faulty or defective materials or methods of construction is not a covered loss." [Id. ¶ 33]. As evidence of a general business practice, Plaintiff points to at five other substantially similar pending or resolved "concrete decay" lawsuits against either Liberty Mutual or companies within the Liberty Mutual Group within the last four years.[1] The Amended Complaint also states that Liberty Mutual and Allstate participate "in the Insurance Services Office, Inc., ("ISO") which is a cooperative organization formed and controlled by its participants for the purpose, among others, of collecting data on the type of claims made, the policy provisions cited

---

[1] *See Belz v. Peerless Insurance Company,* Connecticut Federal District Court Civil Action No. 3:13-cv- 1315 (JCH); *Karas v. Liberty Insurance Corporation,* Connecticut Federal District Court Civil Action No. 3:13-cv-1836 (SRU); *Matthews v. Peerless Insurance Company,* Connecticut Federal District Court Civil Action No. 3:12-cv-01506 (WWE); *Roberts v. Liberty Mutual Fire Insurance Company,* Connecticut Federal District Court Civil Action No. 3:13-cv-00435 (SRU); *Waters v. Liberty Mutual Group, Inc., et al.,* Massachusetts Superior Court, Hampden Division, Docket No. 06-131.

for the basis of each claim, the geographic areas in which the claimed damage has occurred, and the actions taken by insurers in response to such claims." [Id. ¶ 38]. By means of their participation in the ISO, Plaintiff claims that Liberty Mutual and Allstate have joined "in an insurance industry wide practice of denying coverage for concrete decay claims." [Id. ¶ 41].

Plaintiff also argues that Defendant Liberty Mutual was aware of an opinion issued by a court in this district concerning a concrete decay claim against another insurer in *Bacewicz v. NGM Ins. Co.*, in which that court denied a summary judgment by an insurer, finding that a policy exclusion cited here by Liberty Mutual was "reasonably susceptible to more than one reading." No. 3:08-CV-1530 (JCH), 2010 WL 3023882, at *3-6 (D. Conn. Aug. 2, 2010). Plaintiff argues that Liberty Mutual thereafter engaged in a practice of "refusing to attempt in good faith to effectuate prompt, fair and equitable settlements of concrete decay claims in which liability has become reasonably clear."

On August 8, 2014, Plaintiffs filed their original Complaint against Defendant Liberty Mutual. On October 30, 2014, Liberty Mutual moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6), arguing that it fails to state a claim on which relief can be granted due to the exclusion in the Policy for loss to a "foundation" or "retaining wall." Defendant also argued that Plaintiffs' Complaint was fatally vague for failing to state whether the damage occurred during the period of the Liberty Mutual Policy or prior to that Policy taking effect in 2009. After the parties briefed the instant Motion, Plaintiffs sought leave of this Court to amend their Complaint in order to add Allstate as a party, and leave was granted.

5

On March 18, 2015, Plaintiffs filed an Amended Complaint and requested issuance of a summons to Allstate.  Although counsel for Allstate entered an appearance on April 17, 2015, and was a participant in the parties' Rule 26(f) conference, Allstate has not moved to dismiss the Amended Complaint or otherwise filed a timely Answer, the deadline to respond to the Amended Complaint having long since passed.  Plaintiffs have not moved for default judgment as to Allstate and neither Defendant has in any way indicated an intent to rely upon the arguments set forth in Liberty Mutual's Motion to Dismiss the original Complaint.  Nonetheless, as discussed below, the Court can resolve the issues presented by Liberty Mutual's motion.

### Standard of Review

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' "  *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

6

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005)(MRK). Here, Plaintiffs attach the homeowners policies issued by Allstate

7

and Liberty to his complaint as exhibits.  Therefore, the Court may consider the entirety of these Policies to analyze the pending motion to dismiss.

### III.   Discussion

The filing of an Amended Complaint typically renders any motions relevant to the original Complaint moot.  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation omitted) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect."); *Thompson v. Pallito*, 949 F. Supp. 2d 558, 582 (D. Vt. 2013) ("motions addressed to the original complaint are generally regarded as moot upon the filing of an amended complaint").  However, "[i]t frequently happens in the district court that a plaintiff amends its complaint while a motion to dismiss is pending . . . a court then has a variety of ways in which it may deal with the pending motion, from denying the motion as moot to considering the merits of the motion in light of the amended complaint."  *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 80 (D. Conn. 1994)

In the instant case, the Amended Complaint merely recited the same claims against Liberty Mutual against a new Defendant, Allstate.  Otherwise, with one exception, the issues presented by Liberty Mutual's Motion to Dismiss the original complaint, and the factual allegations relevant to those issues, have not changed.  Therefore, the Court will consider Defendant Liberty Mutual's Motion to Dismiss the original Complaint and the issues alleged therein in light of the allegations of the Amended Complaint.  The sole exception is Defendant's

argument that Plaintiffs' claims are fatally vague for failure to identify the policy period in which the damage occurred.  That argument has been rendered moot by the Amended Complaint's addition of Allstate as a party, such that the two Defendants are alleged to have provided coverage throughout the entirety of the existence of the Metsack's home.  That portion of Defendant's Motion to Dismiss which argues for dismissal of the original Complaint on the grounds of vagueness is DENIED as moot.

### A. Count One: Breach of Contract

An insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372–73, 949 A.2d 1084 (2008).  Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7–8 (2011); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("[i]n ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction").

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe, LLC*, 300 Conn. at 260.  A contract is unambiguous when "its language is clear and conveys a definite and

precise intent.... The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* (citation omitted); *Murtha*, 303 Conn. at 9 (same). "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Harbour Pointe, LLC*, 300 Conn. at 260 (citation omitted).

Where the language of an insurance policy is ambiguous, such language must be construed against the insurance company that drafted the policy. *See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 806, 724 A.2d 1117 (1999). However, any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other provisions ... and every provision must be given effect if it is possible to do so.... If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Harbour Pointe, LLC*, 300 Conn. at 261 (citation omitted).

The Metsacks allege that Liberty Mutual is obligated to provide coverage for their alleged losses under Section 8 of the Policy. That Section provides:

> **8. <u>Collapse.</u> We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused by one or more of the following: . . . (b) Hidden decay; . . . or (f) Use of defective material or methods in construction, remodeling or renovation." [Dkt. 30, Ex. A, at 5].**

Liberty Mutual argues for the application of an exclusion contained in Section 8 which states that "[l]oss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, *foundation, retaining wall*, bulkhead, pier, wharf or dock is not included *unless the loss is a direct result of the collapse of a building*."  [*Id.*] (emphasis added).  The parties agree that the damage alleged by Plaintiffs was not a direct result of the collapse of a building.  Thus, Liberty Mutual argues that if the damage to the Metsack's "basement walls" is considered damage to a "foundation" or "retaining wall," Liberty Mutual is not obligated to provide coverage.

The arguments raised by Liberty Mutual here have been persuasively rejected three times by courts in this District.  *See Bacewicz*, 2010 WL 3023882, at *3-6 (D. Conn. Aug. 2, 2010) (denying insurer's motion for summary judgment and finding that a "reasonable juror could conclude that the 'basement walls' did not constitute the 'foundation' of the house"); *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 115-16 (D. Conn. 2014) (denying Liberty Mutual's motion to dismiss and holding that the terms "foundation" and "retaining walls" were ambiguous and should be construed against Liberty Mutual"); *Belz v. Peerless Insurance Co.*, 46 F.Supp.3d 157, 163-164 (D. Conn. 2014) (finding that the terms "foundation" and "retaining wall" are both ambiguous).

Prior courts have held that the term "foundation" could refer to the "footings" of a structure, citing an Alabama Supreme Court case which described the "footings" as a "three-by-three foot piece of concrete under the basement wall."  *Turner v. State Farm Fire and Cas. Co.*, 614, So.2d 1029, 1030 (Ala. 1993).

11

Plaintiff urges that this is a correct statement of the law, arguing that a dictionary definition of "foundation" defines that term as "the lowest load-bearing part of the building."  *See* "Foundation," Oxford American Dictionary and Thesaurus, 2003.  In homes with a basement, the Metsacks argue, the lowest load-bearing part of the building would be the footings underneath the basement wall. Defendant urges a different definition, arguing that a "foundation" is "a usually stone or concrete structure that supports a building from underneath . . . an underlying base or support . . . the whole masonry substructure of a building." *See* "Foundation," Merriam Webster, *available at:* http://www.merriamwebster.com/dictionary/foundation.

Defendant also argues that the result of the above-cited prior cases should not be followed, in part because language elsewhere in the policy indicates that the terms "footings" and "foundation" refer to different parts of the structure. Specifically, an amendatory endorsement to the Policy provides:

> We do not insure, however, for loss . . . [c]aused by: b. Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a: (1) Fence, pavement, patio or swimming pool; (2) *Foundation, retaining wall, or bulkhead*; or (3) Pier, wharf or dock; (4) *Footings.*

[Id. at ] (emphasis added).

However, the separate usage of "footings" and "foundation" elsewhere in the policy is not dispositive here, because a house may or may not have a separate "footing" and "foundation" depending upon its construction.  At the time the subject premises were constructed it was a customary building practice in Connecticut to construct a home by first excavating the site, then erecting

12

footings consisting of a concrete footprint of the house, erecting a basement or foundation consisting of a horizontal base or floor and vertical walls on top of the footings which serves as the home's basement, and erect the above-ground floors and walls of the home on top of the basement.  Employing that method of construction, the footings beneath the basement could constitute a separate structural component serving as the structural support beneath the basement for the house.  In such circumstances, a reasonable trier of fact could conclude the "footings" to be the "foundation."  This interpretation would not render either term superfluous, because, there may be circumstances in which a house has foundational walls, supported by footings, without any basement.  In such circumstances, the "foundation" and "footings" could refer to different elements of the below-ground masonry structure supporting the house, necessitating that the Policy distinguish between the two terms.

This interpretation is supported by the NCRS Engineering Dictionary definition of footings, which defines the "footings" as a building component "made of concrete and used under chimneys and columns as well as under foundation walls to distribute the weight of the structure over a greater area and thus prevent settling . . . [f]ootings are placed below the frostline to prevent movement during freezing."  *See* "Footings," NCRS Construction Dictionary, *available at: Http://www.engineering-dictionary.org/NCRS-Construction-Dictionary/FOOTING.*  Notably, the NCRS Engineering Dictionary has no definition for the term "foundation" or the term "basement."  *Id.*  However, according to the Civil Engineering Dictionary, the purpose of a foundation is "the lowest part of

the structure which supports the structure by distributing its load on the soil and keeping it less than the bearing capacity of soil."  *See* "Foundation," Civil Engineering Dictionary, *available at: http://www.aboutcivil.org/geo-technical-foundation-engineering.html.  A* "foundation" serves to keep "the load on the soil in allowable range by distributing it on a vast calculated area."  *Id.*

In addition, the Policy language prescribing the method of calculating the replacement value of a covered "building" provides further support for the Plaintiffs' position.  Section I(3)(b)(3) of the Policy provides:

> (3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:
>
>> (a) Excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;
>>
>> (b) Those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and
>>
>> (c), Underground flues, pipes, wiring and drains.

[Ex. A. at 9].  The replacement value calculation language is consistent with a customary construction method used in Connecticut at the time the subject premises were constructed.  Further, implicit in the calculation are two key concepts: *first*, that a foundation can exist "below the undersurface of the lowest basement floor," which implies that a basement wall and a foundation are not *always* one and the same, and *second*, that the policy in at least some capacity differentiates between homes constructed with and without a basement by

14

distinguishing "foundation walls . . . if there is no basement" from "foundations below the undersurface of the lowest basement floor."

Because both parties have offered reasonable, but differing interpretations of the term "foundation," each supported by dictionary definitions and language cited elsewhere in the Policy, the Court finds the term "foundation" to be ambiguous.[2]

Similarly, the Court is persuaded that the phrase "retaining wall" is ambiguous. Defendant argues that a dictionary defines "retaining wall" as "a wall built to resist lateral pressure other than wind pressure; esp: one to prevent an earth slide." *See* "Retaining Wall," Merriam Webster, *available at:* http://www.merriamwebster.com/dictionary/retaining%20wall. Plaintiff counters that a "retaining wall" is defined as "a wall for holding in place a mass of earth or the like, as at the edge of a terrace…" *See* "Retaining Wall," Dictionary.com, *available at:* http://dictionary.reference.com/browse/retaining+wall. Although Plaintiff's definition would conform with a more colloquial understanding of the phrase "retaining wall" as typically referring to a free-standing structure, the

---

[2] Given that the term "foundation" is ambiguous, the Court notes that Plaintiff's interpretation is potentially supported by the interpretative principal of *noscitur a sociis*, as "the meanings of particular words may be indicated or controlled by associated words" 11 Williston on Contracts § 32:6 (4th ed.). The Policy exclusion applies to an: "awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock." With the exception of "foundation," all of the terms used in the exclusion reference ancillary structures to the building itself. A reasonable trier of fact could conclude that the other terms used in the exclusion shed light on the term "foundation" and suggest that term to be a reference to a more ancillary structure than the wall of a basement room.

Court finds either definition to be reasonable.  As such, the term "retaining wall" is also ambiguous. In addition,

The Metsacks have sufficiently pled a cause of action for breach of contract.  The allegations of the Complaint more than sufficiently put Liberty on notice of the nature of their claim, fully satisfying the requirements of Rule 8 of the Federal Rules of Civil Procedure.  Liberty Mutual's motion to dismiss Count One is DENIED.

### B.  Count Two: Breach of Covenant of Good Faith and Fair Dealing

The duty of good faith and fair dealing "is a covenant implied into a contract or a contractual relationship," and every contract "carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement . . . ."  *Renaissance Mgmt. Co., Inc. v. Conn. Hous. Fin. Auth.*, 281 Conn. 227, 240 (Conn. 2007) (*quoting De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432–33 (Conn. 2004)). Implicit in every contract is a covenant of good faith and fair dealing. "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."  *Id.*; *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 795 (Conn. 2013) (same).  "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an

honest mistake as to one's rights or duties, but by some interested or sinister motive . . . [b]ad faith means more than mere negligence; it involves a dishonest purpose." *De La Concha*, 269 Conn. at 433; *Capstone Bldg. Corp.*, 308 Conn. at 795 (same); *TD Bank, N.A. v.. J & M Holdings, LLC*, 143 Conn.App. 340, 348 (Conn. App. Ct. 2013) (same).

In the context of an insurance policy, "[a] bad faith action must allege denial of the receipt of an express benefit under the policy." *Capstone Bldg. Corp.*, 308 Conn. at 794.  Any cause of action for bad faith "not tied to duties under the insurance policy must therefore fail as a matter of law." *Id.* at 797. Because the Court finds that Plaintiffs have stated a plausible claim for an express benefit under the Policy covering the alleged loss, the question becomes whether Plaintiffs have alleged that Liberty Mutual acted with "actual or constructive fraud" or a "design to mislead" or have acted with "neglect or refusal to fulfill" its duties.  *De La Concha*, 269 Conn. at 433.

Plaintiffs argue that Liberty Mutual "denied their claim without any investigation" and misled Plaintiffs "into believing that there was no coverage by citing inapplicable policy language."  Prior courts in this District have found these same allegations sufficient to state a claim for breach of the covenant of good faith and fair dealing at the 12(b)(6) stage.  *See Karas*, 33 F. Supp. 3d at 116-117 (rejecting motion to dismiss good faith claim where "denial of coverage was made without the benefit of any inspection of the basement walls at issue in order to verify the damage or its possible causes"); *Belz*, 46 F.Supp.3d at 164-165 (rejecting motion to dismiss good faith claim where insurer was alleged to have

"intentionally referred to irrelevant and misleading portions of the Policy").  The Court notes that this is not the first "concrete decay" claim in which Liberty Mutual or a related insurer within the Liberty Mutual Group has initially denied coverage on one basis – here based upon language excluding "settling" or "seepage" of groundwater – only to later raise arguments that the affected structures were excluded "foundation[s]" or "retaining wall[s]."  *See Belz*, 46 F.Supp.3d at 165 (noting that "the arguments made by Peerless in support of its Motion to Dismiss do not mention the exclusions cited in the denial letter"). The Court also finds that Liberty Mutual could have acted in bad faith by describing a structural wall as a "foundation" without any inspection of the premises.  These allegations support a plausible claim for breach of the covenant of good faith and fair dealing.   Liberty Mutual's motion to dismiss Count Two is DENIED.

### C.  Count Three: CUIPA and CUTPA Claims

CUIPA does not provide a private right of action, but, the Connecticut Supreme Court has recognized "the existence of a private cause of action under CUTPA to enforce alleged CUIPA violations."  *Mead v. Burns*, 199 Conn. 651, 663, 509 A.2d 11 (Conn. 1986).  However, "conduct by an insurance broker or insurance company that is related to the business of providing insurance can violate CUTPA only if it violates CUIPA," because "the legislative determinations as to unfair insurance practices embodied in CUIPA are the exclusive and comprehensive source of public policy in this area."  *State v. Acordia, Inc.*, 310 Conn. 1, 9-12, 73 A.3d 711 (Conn. 2013).

Section 38a–816 of CUIPA proscribes "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance," including "unfair claim settlement practices."  Conn. Gen.Stat. § 38a–816.  Plaintiffs have alleged that Liberty Mutual violated these unfair claim settlement practices provisions.  *See* Conn. Gen.Stat. § 38a–816(6)(C) (failure "to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies"); Conn. Gen.Stat. § 38a–816(6)(D) (refusal "to pay claims without conducting a reasonable investigation based upon all available information").  Unfair claim settlement practices constitute a CUIPA violation when they are "[c]ommitt[ed] or perform[ed] with such frequency as to indicate a general business practice."  Conn. Gen.Stat. § 38a–816(6).

Although Plaintiff has pointed to five other legal actions against Defendant alleging similar "concrete decay" claims, Liberty Mutual argues that these actions were brought against "distinct and separate entities within the Liberty Mutual Group."  In rejecting motions to dismiss similar "concrete decay" claims under CUIPA, two prior courts in this District have looked to:

> "[t]he degree of similarity between the alleged unfair practices in other instances and the practice allegedly harming the plaintiff; the degree of similarity between the insurance policy held by the plaintiff and the policies held by other alleged victims of the defendant's practices; the degree of similarity between claims made under the plaintiff's policy and those made by other alleged victims under their respective policies; and the degree to which the defendant is related to other entities engaging in similar practices."

> *Belz*, 46 F.Supp.3d at 166; *see also Karas*, 33 F. Supp. 3d at 117.

Although Liberty Mutual is entitled to present evidence establishing that its various related entities have approached "concrete decay" claims independently and without a general business practice across related entities at the summary judgment stage of the proceedings, Plaintiff has plausibly alleged a pattern of "concrete decay" claims across related entities at this stage of the proceedings.

Defendant also argues that its mere "participation" in an ISO or "the use of ISO forms in insurance policies" does not support a claim for a violation of CUTPA/CUIPA.  One prior court has held that the ISO allegation could plausibly establish "a mechanism" by which Liberty Mutual could have shared information with other insurers regarding denial of "concrete decay" claims and "methods to avoid liability for such cracking."  *Belz*, 46 F.Supp.3d at 166.  Although the ISO allegation strikes this Court as failing to cross the line between "possible" and "plausible," at this stage the number of substantially related claims before courts in this jurisdiction alone supports a plausible allegation of a general business practice within the Liberty Mutual Group.  Liberty Mutual's motion to dismiss Count Three is DENIED.

IV.   <u>Certification</u>

Defendant argues that the issues presented in this action are "ripe for adjudication by the Connecticut Supreme Court" and argues for certification to the Connecticut Supreme Court pursuant to Conn. Gen. Stat. § 51-199b(d). Defendant seeks to certify the question of whether the terms "foundation" and "retaining wall" are ambiguous.  The Connecticut Supreme Court, however, has

provided the necessary guidance for this Court to determine whether, under Connecticut law, an ambiguity exists in a given contract.  *See* Part IIIA, *supra*.  It is presently premature to certify to the Connecticut Supreme Court the question of whether the term "foundation" as used in the Liberty policy is ambiguous. Certification of questions related to these issues could possibly be appropriate at a later stage in this litigation, upon the development of a factual record regarding both the Property and the Policy at issue that would be helpful to an appellate court.

## V.    <u>Conclusion</u>

For the foregoing reasons, Defendants' [Dkt. 14] Motion to Dismiss the Complaint is DENIED.

**IT IS SO ORDERED.**

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 30, 2015

21