UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN A. METSACK AND | : | NO.:  3:14-CV-01150-VLB |
| GAIL D. METSACK | : | |
| | : | |
| v. | : | |
| | : | |
| LIBERTY MUTUAL FIRE INSURANCE | : | |
| COMPANY | : | JULY 1, 2016 |

MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

The defendant, Liberty Mutual Fire Insurance Company ("Liberty"), hereby submits this memorandum of law in support of its motion for summary judgment.

I.      BACKGROUND AND FACTS:

This is an action for breach of an insurance contract, bad faith, and unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA") against both Liberty and co-defendant, Allstate Insurance Company ("Allstate").   The facts giving rise to this action are as follows: Liberty issued a homeowners policy, Policy Number H32-218-369684-40 (hereinafter the "Policy"), to the plaintiffs, Gail and Stephen Metsack. Ex. B.  The Policy had

effective dates of September 9, 2013 through September 9, 2014, and provided dwelling coverage limits of $299,300.  Ex. B, p. 2.

The plaintiffs initiated this action by way of summons and complaint filed August 8, 2014.  The plaintiffs subsequently amended their complaint on March 18, 2015.  In the amended complaint, the plaintiffs allege that they purchased the subject property in 1991 and constructed the residence in 1992. Ex. C, ¶ 5.  The plaintiffs allege that they insured their property at all times between June of 1991 and September of 2009 with a homeowners policy issued by Allstate and since September 2009 with a homeowners policy issued by Liberty.  Ex. C, ¶ 6 and ¶ 55.  They claim that they noticed a series of horizontal and vertical cracks throughout most of the basement walls of their home in the spring of 2014.  Ex. C, ¶ 9.

They alleged that the cause of the "pattern cracking" was due to a chemical compound found in concrete most likely provided by the J.J. Mottes Concrete Company.  Ex. C, ¶ 11.  The plaintiffs allege that the aggregate used in the concrete contained a chemical compound which has begun to oxidize and expand.[1]  Ex. C, ¶ 12.  They claim that the oxidation process cannot be arrested, that it continues to advance with or without the presence of visible water, and

---

[1] Liberty's petrographic analysis has confirmed that  the iron sulfide oxidation process commonly attributed to substandard Mottes concrete has occurred in the plaintiffs' basement walls. Ex. L, p. 7.

that it is only a matter of time before the basement walls will fall in due to the exterior pressure from the surrounding soil, resulting in the building falling into the basement.   Ex. C, ¶ 13 and ¶ 15-16.    The plaintiffs have pled that a substantial impairment to the structural integrity of their basement walls occurred "at some point" between 1992 and April of 2014.  Ex. C, ¶ 14.

The plaintiffs reported their claim to Liberty on April 18, 2014. Ex. D, p. 6. Liberty dispatched Melissa Ferguson of Dineley Claims Services to analyze the plaintiffs' basement walls, which she did on April 25, 2014.  Ex. H.  Liberty relied on Ms. Ferguson's report in denying coverage via correspondence dated May 12, 2014.  Ex. I.

The plaintiffs allege that Liberty has breached its contract by not providing coverage under the Policy for the alleged loss.  The extra-contractual allegations are that Liberty has a general business practice of denying  what their attorneys refer to as "concrete decay" claims as part of its participation in an insurance industry-wide conspiracy and that Liberty intentionally and in bad faith denied the claim based upon clearly inapplicable policy provisions.

The Policy, as modified by its various endorsements, states in relevant part:

---

**SECTION I—PERILS INSURED AGAINST**

---

**COVERAGE A—DWELLING and COVERAGE B—OTHER STRUCTURES**

**We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss:**

1.  **Involving collapse, other than as provided in Additional Coverage 8.;**

2.  **Caused by:**

    **. . . .**

    b.  **Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:**

        **. . . .**

        (2)  **Foundation, retaining wall, or bulkhead; or**

        **. . . .**

        (4)  **Footing(s)**

        **. . . .**

    e.  **Any of the following:**

        (1)  **Wear and tear, marring, deterioration;**

        (2)  **Inherent vice, latent defect, mechanical breakdown;**

        (3)  **Smog, rust or other corrosion;**

            **. . . .**

        **(6)**    **Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;**

**. . . .**

**ADDITIONAL COVERAGES**

**. . . .**

**8.**    **Collapse.   We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:**

    **a.**    **Perils Insured Against in COVERAGE C—PERSONAL PROPERTY.   These perils apply to covered buildings and personal property for loss insured by this additional coverage:**

    **b.**    **Hidden decay;**

    **c.**    **Hidden insect or vermin damage;**

    **d.**    **Weight of contents, equipment, animals or people;**

    **e.**    **Weight of rain which collects on a roof; or**

    **f.**    **Use of defective material or methods in construction, remodeling or renovation;**

**Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.**

**Collapse does not include settling, cracking, shrinking, bulging or expansion.**

**This coverage does not increase the limit of liability applying to the damaged covered property.**

**. . . .**

---

### SECTION I—EXCLUSIONS

---

1.  **We do not insure for loss caused directly or indirectly by any of the following.   Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.**

    **. . . .**

    b.  **Earth Movement, meaning earthquake including land shock waves or tremors before, during or after volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting;  . . .**

    c.  **Water Damage, meaning:**

        (1)  **Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;**

        (2)  **Water which backs up through sewers or drains or which overflows from a sump;**

        (3)  **Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.**

    **. . . .**

    e.      **Neglect, meaning neglect of the "insured" to use all reasonable means to save and preserve property at and after the time of a loss.**

**. . . .**

2.      **We do not insure for loss to property described in Coverages A and B caused by any of the following.  However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.**

**. . . .**

    c.      **Faulty, inadequate or defective:**

        (1)    **Planning, zoning, development, surveying, siting;**

        (2)    **Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;**

        (3)    **Materials used in repair, construction, renovation or remodeling; or**

        (4)    **Maintenance;**

        **of part or all of any property whether on or off the "residence premises."**

**. . . .**

---

**SECTION I—CONDITIONS**

---

**. . . .**

2.      **Your Duties After Loss.  In case of a loss to covered property, you must see that the following are done:**

    a.      **Give prompt notice to us or our agent;**

**. . . .**

**d.    Protect the property from further damage.  If repairs to the property are required, you must:**

       **(1)    Make reasonable and necessary repairs to protect the property; and**

       **(2)    Keep an accurate record of repair expenses;**

**. . . .**

**8.    Suit Against Us.  No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.[2]**

**. . . .**

**SECTIONS I AND II—CONDITIONS**

**1.    Policy Period.  This policy applies only to loss in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.**

**(Ex. B).**

**. . . .**

**Liberty moves for summary judgment as to all counts on the grounds that the Policy does not provide coverage for the plaintiffs' claim, it evaluated and denied the claim on its own merits, and the plaintiffs' allegations of a general**

---

**[2]  The Policy was issued after the July 1, 2012 effective date of Public Act No. 12-162, which statutorily extended the suit limitations period for claims under Connecticut homeowners policies from twelve to eighteen months (Conn. Gen. Stat. § 38a-308 (b)).**

business practice of denying "concrete decay" claims and Liberty's participation in an insurance industry-wide conspiracy regarding its claim denial have no factual basis.

## II.   LAW AND ARGUMENT:

### A.   Standard Of Review:

The court shall render summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).   A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson*, 477 U.S. at 247-48.   A "material fact" is one whose resolution would affect the ultimate determination in the case.  *Id.*  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims… and it should be interpreted in a way that allows it to accomplish this purpose."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548 (1986).

A non-moving party may not rely on mere allegations, legal conclusions, unsupported statements, or a denial of the pleadings.  *See Celotex Corp.*, 477 U.S. at 327.  "[A] plaintiff must do more than whet the curiosity of the court; he

9

must support vague accusation and surmise with concrete particulars." *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 96 (2nd Cir. 1970).  The opposing party is entitled to the benefit of all favorable inferences which can be drawn from the underlying facts; however, only *reasonable* inferences will be drawn, not every conceivable inference.  *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987).  "[T]he inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind…."  *NLRB v. Martin A Gleason, Inc.*, 534 F.2d 466, 474 (2nd Cir. 1976).

B.    <u>There Is No Coverage For The Plaintiffs' Claim:</u>

1.    **The undefined policy terms "foundation" and "retaining walls" are unambiguous:**

The plaintiffs' claim is clearly barred by the Policy provision which excludes coverage for loss caused by faulty, inadequate or defective materials used in construction.   Moreover, their claim is unquestionably barred by the Policy provisions which exclude losses caused by water damage and disclaims losses caused by settling, shrinking, bulging or expansion, including resultant cracking.  As such, the plaintiffs seek coverage for their claim pursuant to the "collapse" provision of the Policy.  However, the "collapse" provision excludes coverage for loss to a foundation or retaining wall unless the loss is a direct

10

result of the collapse of the building.  The terms "foundation" and "retaining wall" are not defined in the Policy, but merely because a term is undefined does not render it ambiguous.

Liberty appreciates this Honorable Court's prior rulings in matters with substantially identical allegations wherein this Court held that the undefined policy terms "foundation" and "retaining wall" were ambiguous, including its September 30, 2015 ruling in this matter.  *See, Bacewicz v. NGM Ins. Co.*, 2010 WL 3023882 (D.Conn. 2010); *Karas v. Liberty Ins. Corp.*, 33 F.Supp. 3d 110 (D.Conn. 2014); *Belz v. Peerless Ins. Co.*, 46 F.Supp. 3d 157 (D.Conn. 2014).  As such, Liberty will not revisit its entire argument that these terms are unambiguous. However, it respectfully disagrees with this Court's prior determinations.  Moreover, this Court has recently inferred that the September 30, 2015 decision denying the motion to dismiss the breach of contract claim in this matter may have been wrongly decided.  *See, Roberge v. Amica Mutual Ins. Co.*, 2015 WL 9480008, p. 2-3 (D.Conn. 2015).

In its prior rulings which determined that "foundation" is ambiguous, this Court relied upon its *Bacewicz* decision.  No Connecticut appellate court has addressed this issue.  Only one appellate court has had an opportunity to consider this language in a similar matter; interestingly enough, it was the plaintiffs' attorney's suit to recover for the "collapse" of his wife's basement

11

walls.  *Parker v. Worcester Ins. Co.*, 247 F.3d 1 (1st. Cir. 2001). The policy contained a substantially identical collapse provision. The argument that "foundation" and "retaining wall" were ambiguous was not made through the time of appeal, despite eleven references in the opinion to the basement walls as either the "foundation" or "foundation walls."  The First Circuit noted in *Parker* that "[u]nless there is a rabbit hidden somewhere in the hat, it is not apparent to us how Kathy Parker can establish coverage."  *Parker*, 247 F.3d at 6.  The Court noted that while "lawyers are inventive in finding ambiguities to construe against the insurer. ...we think it is fair to point out the apparent difficulties..."[3] *Id.* Thus, the First Circuit did not consider "foundation" or "retaining wall" to be ambiguous.  However, it accurately forecasted what lie ahead in the interpretation of the "collapse" provision—lawyers inventing ambiguities where none actually exist.

The Supreme Court of Connecticut in *Beach v. Middlesex Mut. Ass. Co.*, 205 Conn. 246 (1987)—the seminal case in this state interpreting the undefined policy term "collapse"—repeatedly referred to the basement walls as

---

[3] In detailing the apparent futility of a contractual ambiguity argument, the First Circuit noted that its opinion was without prejudice to resolution after full briefing.

12

"foundation walls" and the "foundation."[4]   Thus, Liberty believes that the Supreme Court of Connecticut will make a similar finding as that made in *Wurst v. State Farm Fire and Casualty Company*, 431 F.Supp.2d 501 (D. N.J. 2006); namely, that the undefined policy term "foundation" includes the concrete basement walls.

A Massachusetts Superior Court found no ambiguity in the undefined policy terms "foundation" and "retaining walls" in *Shoemaker v. Liberty Mut. Ins. Co.*, 17 Mass.L.Rptr. 57 (Mass. Super. Ct. 2003), wherein the plaintiffs sought recovery for the collapse of the foundation wall at the right rear underneath the attached garage.  The court ruled for the insurer, citing the exclusions under the "Collapse" provision for "loss to a…foundation, retaining wall…"   The Shoemakers did not argue that "foundation" or "retaining wall" was ambiguous and the opinion made clear that any such argument would have proven unsuccessful:

> "…loss to a foundation is within a list of ancillary items to a home under the plain terms of the provision.  The ancillary terms are not part of the building.  As such, reading the provision to allow for insurance coverage when the collapse of the Shoemakers' 'foundation' was not caused by the collapse of the garage itself, would render the exclusionary phrase, '…unless the loss is a direct result of the collapse of a building,' meaningless." *Id.*

---

[4] The earliest Connecticut matter concerning allegedly defective Mottes concrete also repeatedly refers to the basement walls as the foundation.  *See, Tofolowsky v. Bilow*, 2003 WL 1475141 (Conn. Super. 2003).

Moreover, in *Beach*, the Connecticut Supreme Court repeatedly referred to basement walls as retaining walls when construing homeowners policy terms. *Beach*, 205 Conn. at 249.  *See also*, *Nix v. State Farm Fire & Cas. Co.*, 444 Fed.Appx. 388 (11th Cir. 2011) (collapse of retaining wall in basement of insureds' home excluded from coverage).  Thus, even if the concrete basement walls that support the plaintiffs' home are not part of the "foundation" (which is expressly denied), they are retaining walls that prevent earth from entering the basement.  Merriam-Webster defines retaining wall as "a wall built to resist lateral pressure other than wind pressure; *esp*: one to prevent an earth slide".[5] The Oxford American English Dictionary defines retaining wall as "a wall that holds back earth or water."[6] The Free Dictionary by Farlex defines retaining wall as "A wall built to hold back a mass of earth or water."[7]

In its order denying Liberty's motion to dismiss in this matter, this Court found "retaining wall" to be ambiguous.  In doing so, it relied on the plaintiffs' definition of a retaining wall which conformed with a supposed "colloquial understanding" of the phrase as referring to a free-standing structure.  However, there is no authority cited that reflects that this is a colloquial understanding of

---

[5] http://www.merriam-webster.com/dictionary/retaining%20wall.
[6] http://www.oxforddictionaries.com/us/definition/american_english/retaining-wall?q=retaining+wall.
[7] http://www.thefreedictionary.com/retaining+wall.

14

"retaining wall." Moreover, this Court failed to cite any authority for the proposition that a supposed colloquial understanding can trump all cited dictionary authority and a decision of the Connecticut Supreme Court which repeatedly refers to basement walls as "retaining walls."

The purpose of a retaining wall is to hold back earth. Whether the wall is free-standing or attached to a structure, if it serves that function, it is a retaining wall. Liberty contends that the undefined terms "foundation" and "retaining wall" are unambiguous and clearly encompass the basement walls.

2. **Extrinisic evidence reveals that the claimed loss is to the foundation:**

In the event that this Court chooses to adhere to its prior ruling that the Policy terms "foundation" and "retaining wall" are ambiguous, the analysis does not conclude there. The standard for the ultimate resolution of a purported ambiguity in an insurance contract was set forth by the Connecticut Supreme Court in *Metro Life Ins. Co. v. Aetna Cas. and Sur. Co.*, 255 Conn. 295, 306 (2001): "If the policy is ambiguous, extrinsic evidence may be introduced to support a particular interpretation…If the extrinsic evidence presents issues of

credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact ....[internal citations omitted]."[8]

The Chief Justice of the Supreme Court of Connecticut, Chase T. Rogers, authored a concurring opinion joined by Justice Peter T. Zarella which reinforced the *Metro Life* holding :

> "…in the event that an insurance policy term is deemed to be ambiguous, the parties are entitled to present extrinsic evidence regarding the mutual intent of the insured and the insurer as to the scope of coverage, and the trial court must consider that evidence before applying the rule of contra proferentem to resolve the ambiguity in favor of the insured.  In other words, the rule should be applied as a tie breaker only when all other avenues to determining the parties' intent have been exhausted."

*Connecticut Ins. Guar. Ass'n. v. Drown*, 314 Conn. 161, 195 (2014).

The *Drown* dissent, authored by Justice McDonald and joined by Justice Eveleigh, also noted the same principle that "because the parties both have advanced reasonable constructions, I believe we properly may consider undisputed extrinsic evidence." *Drown*, 314 Conn. at 209.  That is four of the seven current justices of the Supreme Court of Connecticut reiterating long-standing Connecticut law.  *See also, Connecticut Ins. Guar. Ass'n. v. Fontaine*,

---

[8] This Court recognized this standard in *Bacewicz*., 2010 WL 3023882 at 3 ("Where contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered, and the determination of the parties' intent is a question of fact [internal citations omitted]").

278 Conn. 779, 788 (2006) ("Thus, having concluded that the relevant policy language is ambiguous, we ordinarily would be free to consider extrinsic evidence, although if the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact…The present case is, however, before both the trial court and this court on a statement of stipulated facts, and, accordingly, the language falls into the category of ambiguities 'that cannot be resolved by examining the parties' intentions.").

While Liberty disagrees with this Court's prior rulings that the terms "foundation" and "retaining walls" are ambiguous and maintains that there is sufficient reason to believe the Supreme Court of Connecticut would hold differently, it respects this Court's determination.  However, ultimately the trier of fact—which will be the jury should this matter proceed to trial—will determine whether it can resolve the supposed ambiguities and reach the mutual intent of the parties as to these terms upon consideration of the extrinsic evidence if the extrinsic evidence presents issues of credibility or choices among reasonable inferences.  Only if it cannot will any ambiguities be construed against the defendant.

In this matter, the extrinsic evidence presents no issues of credibility or choice among reasonable inferences.   No reasonable jury could resolve the purported ambiguities in the plaintiffs' favor.

The plaintiffs are extremely sophisticated and well-versed in residential construction. So much so that the Metsacks acted as their own general contractor in building their home.   Ex. P, p. 9.[9]   To construct their basement walls, they retained Irwin J. Stevenson.   Ex. P, p. 9.   Mr. Stevenson's company was called Jake's Foundation.   Ex. G, pp. 116-117.   Mr. Metsack found Mr. Stevenson when he consulted the phone book in order to retain a company to construct his basement walls, at which time he came across Jake's Foundation. Ex. G, p. 117.

Mr. Metsack's brother-in-law, L.J. Moulton, is a draftsman who drew the blueprints for the construction of the premises. Ex. G, pp.  72 and 130).  One of the blueprints is titled "foundation plan."  Ex. Q.  The foundation plan includes the basement walls, not just the footings.   Ex. Q, Ex. G, pp. 130-131.   Mrs. Metsack saw this blueprint document prior to the house being built.  Ex. E, p. 53.

The Metsacks produced a 1991 Uniform Residential Appraisal Report ("appraisal") prepared by Robert R. Morra during discovery.   Ex. R.   The

---

[9] Mr. Metsack also previously worked for years for multiple home builders who poured foundations, Richard Cheney and Stephen D. Williams.  Ex. G., pp. 24-25, 29.

appraisal contains a section for "foundation" under which the slab and basement are listed.  Ex. R, p. 1.

The plaintiffs' expert structural engineer, David Grandpre, has testified that the terms "foundation walls", "foundation", and "basement walls" are used interchangeably.  Ex. J, p. 71.  He has testified that "basement walls" are defined as part of the foundation in the currently-adopted Connecticut residential building code and are considered as such in the engineering industry Ex. M, p. 2-3; Ex. F, p. 70-71.   The plaintiffs' expert building contractor, Dean Soucy, also uses the term "foundation" interchangeably with the term "basement walls." Ex. K, pp. 18, 23, 35, 39.

The Metsacks' experience in acting as the general contractor for the construction of their home, Mr. Metsack's years of working for home builders who poured foundations, and the Metsacks' exposure to documents prepared on their behalf in connection with the construction of the premises which referred to their basement walls as the foundation lead to the inescapable conclusion that the Metsacks knew full well what the term "foundation" meant in their Policy prior to purchasing the initial Liberty Policy.[10]

---

[10] The multi-part NBC Connecticut investigative series which commenced in July of 2015 regarding allegedly defective Mottes concrete refers to these "concrete decay" claims as concerning "crumbling foundations."

The plaintiffs have put forth a clever argument to avoid the exclusion of coverage for the cracking to their foundation.  However, clever legal arguments do not override unambiguous Policy language.  The terms "foundation" and "retaining wall" are not ambiguous.  However, even if they were, the extrinsic evidence reveals that these terms—and particularly "foundation"—were understood by all parties to refer to the basement walls.  No reasonable jury could conclude otherwise.  The Connecticut Supreme Court has summarized it best:  "It would make absolutely no sense to require the trial court to construe the agreement against the defendant if the extrinsic evidence showed that it was more likely than not that the parties had a contrary intent." *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 108 (2014).

3.     Any claimed substantial impairment to the structural integrity of the basement walls did not occur during a Liberty policy period:

The law in the state of Connecticut is that the undefined policy term "collapse" is sufficiently ambiguous to include coverage for any substantial impairment to the structural integrity of a building.[11]  *Beach*, 205 Conn. at 252. Mr. Grandpre prepared an affidavit concerning his understanding of the iron sulfide oxidation process in a lawsuit with substantially identical allegations.

---

http://www.nbcconnecticut.com/troubleshooters/TroubleshootersInvestigationCrumbling-Foundations-Home-Basement-Concrete-318061181.html.
[11] Liberty maintains that basement walls are not part of the building.

Ex. O.  Mr. Grandpre has testified that basement walls afflicted with defective concrete wherein the iron sulfide oxidation process was unfolding would suffer a substantial impairment to their structural integrity between ten-to-fourteen years after pour.  Ex. F, p. 100-103.  His opinion fits the timeline for when a homeowner whose foundation was afflicted with this alleged Mottes concrete problem would notice a "tremendous amount of cracks and discoloration in the foundation."  *Tofolowsky*, 2003 WL 1475141 at 1 (foundation constructed in 1984, cracking noticed in 1993, tremendous amount of significant cracking noticed in 1995).  The Tofolowskys were so concerned with the cracks during this time that they contacted a home builder, concrete supplier, and engineer. They had compressive strength testing and a petrographic analysis performed. *Id.* at 2.  The Metsacks' basement has always been unfinished. Ex. G, p. 110.

It is undisputed that the basement walls at the plaintiffs' property are comprised of concrete wherein iron sulfide minerals have oxidized and that such oxidation has resulted in cracks.  It is also undisputed that these walls were poured in 1992.  Thus, according to the plaintiffs' engineering expert the substantial impairment to structural integrity occurred sometime between 2002 and 2006.  Liberty did not insure the property until September 9, 2009.  Thus, according to Mr. Grandpre's testimony, any substantial impairment to the

structural integrity of the basement walls occurred prior to Liberty insuring the

risk.  The "Policy Period" condition in the Policy bars this claim against Liberty.

    4.      **Certification To The Connecticut Supreme Court Is Appropriate:**

This Court can certify undecided issues of state law to the Connecticut

Supreme Court pursuant to Conn. Gen. Stat. § 51-199b(d).  Section 82-1 of the

Connecticut Practice Book provides:   "The supreme court may answer

questions of law certified to it by a court of the United States . . . when requested

by the certifying court if the answer may be determinative of an issue in pending

litigation in the certifying court and if there is no controlling appellate decision,

constitutional provision or statute of this state."  As the Second Circuit Court of

Appeals has noted:

> Connecticut law permits the federal certification of questions of
> state law directly to the Connecticut Supreme Court 'if the answer
> may be determinative of an issue in pending litigation in the
> certifying court and if there is no controlling appellate decision,
> constitutional provision or statute of this state.'  *See* Conn. Gen.
> Stat. § 51-199b(d) (2002).  And '[t]his Court has long recognized that
> state courts should be accorded the first opportunity to decide
> significant issues of state law through the certification process.'
> *Parrot v. Guardian Life Ins. Co. of America,* 338 F.3d 140, 144 (2d
> Cir. 2003).

*Caruso v. Siemens Business Commicatons Systems, Inc.*, 392 F.3d 66, 69 (2d

Cir. 2004).

This Court noted in its order denying Liberty's motion to dismiss that it was premature to certify to the Connecticut Supreme Court the question of whether the terms "foundation" and "retaining wall" are ambiguous.  However, it noted that certification could possibly be appropriate at a later stage. Liberty respectfully submits that this stage has arrived, especially in light of the exponential proliferation of claims and lawsuits concerning substantially identical issues in the past year due to extensive news coverage.

In *Beach*, the Connecticut Supreme Court ruled that  the undefined policy term "collapse" is "sufficiently ambiguous to include coverage for any substantial impairment to the structural integrity of a building."  *Beach*, 205 Conn. at 252.  It did not define what is meant by a "substantial impairment to the structural integrity of a building."

The Ninth Circuit Court of Appeal recently certified the question of how to define the undefined policy term "collapse" to the Washington Supreme Court, which held that "collapse" means "substantial impairment to the structural integrity of a building or part of a building that renders such building or part of a building unfit for its function or unsafe."  *Queen Ann Park Homeowners Ass'n. v. State Farm Fire and Cas. Co.*, 352 P. 3d 790, 791 (Wash. 2015).  The "substantial impairment" must be one that is "so severe as to materially impair a building's ability to remain upright."  *Queen Ann*, 352 P. 3d at 794.  In so ruling,

the court noted that the policy at issue—like Liberty's here—had specific language excluding "settling, cracking, shrinking, bulging, or expansion" from its definition of "collapse" so that a "substantial impairment" must mean something more than these excluded phenomenon. *Id.* at 794.

The Metsacks' claim—and those of other homeowners—would be excluded from coverage in Washington state.  In Connecticut, these claims flood the courts carrying potential extra-contractual liability before an appellate court has weighed in.  It is in the best interests of policyholders, insurers, and judicial efficiency to have an answer as to:

    a. Whether the undefined policy terms "foundation" and "retaining walls" are ambiguous;

    b. Whether a basement or crawlspace wall is part of the "building"; and

    c. What is meant by a "substantial impairment to structural integrity?"

As such, Liberty respectfully requests that these questions be certified to the Connecticut Supreme Court for conclusive determination.

    C. <u>No reasonable jury could conclude that Liberty acted in bad faith:</u>

The Supreme Court of Connecticut has held that absent a wrongful denial of a benefit under the Policy, there can be no action for bad faith.  *Capstone Building Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 794-98, 67 A.3d

961 (2013).   Thus, Liberty is entitled to summary judgment on Count II if this Court rules in Liberty's favor as to the plaintiffs' breach of contract count.

The standard for bad faith is well-established:  "Bad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties. . . . [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will."  *Buckman v. People Express, Inc.*, 205 Conn. 166, 171, 530 A.2d 596 (1987).

"Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose (citation and internal quotation marks omitted)."  *De La Concha of Hartford, inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 433, 849 A.2d 382 (2004).

> Disagreement between an insurer and insured as to coverage of the appropriate amount to which the insured is entitled is not equivalent to bad faith and, standing alone, does not evince dishonest purpose. The insured's demand may itself be excessive

and unwarranted, or the insurer's rejection of the claim may be erroneous but honestly held.

With respect to the implied covenant of good faith and fair dealing, "[a] party to a contract is entitled to take reasonable positions to protect its interests and to resist efforts that would compromise its legal rights," *Elliot v. Staron,* 46 Conn.Sup. 38, 48 (1997), affirmed 54 Conn.App. 532 (1999); appeal dismissed, 255 Conn. 18 (2000). Reasonable measures may include the refusal to pay benefits to an insured. *Sansone v. Nationwide Mutual Fire Insurance Co.,* 62 Conn.App. 526 (2001).

*Jones v. Standard Fire Ins. Co.*, 2013 WL 541015 (Conn.Super. 2013).

"Evidence of a mere coverage dispute…will not demonstrate a breach of good faith and fair dealing."  *Uberti v. Lincoln Nat'l Life Ins. Co.*, 144 F.Supp. 2d 90 (D. Conn. 2001).

The evidence and testimony reveals that this lawsuit concerns a mere coverage dispute.  Prior to the commencement of extensive news coverage regarding crumbling foundations in the summer of 2015 there was not widespread attention given to these claims.  Furthermore, the plaintiffs never presented a "concrete decay" or "collapse" claim to Liberty.  This is despite the fact that prior to reporting the claim to Liberty, Mr. Soucy had already inspected the property and alerted the plaintiffs that they had the Mottes concrete problem. Ex. G, pp. 75 and 78; Ex. E, p. 28.

The claim was reported to Liberty by Mrs. Metsack on April 18, 2014.  Ex. E, p. 55.  Mrs. Metsack has testified that she never mentioned Mottes, defective

concrete, similar claims and lawsuits pending in Tolland County, or the supposed "collapse" of her basement walls to Liberty.  Ex. E, pp. 58-59.  Mrs. Metsack's claim concerned water infiltration and "damage" to the basement walls.  Ex. E, p. 28 and 58.

Liberty evaluated and denied the claim which was actually presented; namely, infiltrating ground water and cracks in the walls.  Ex. I.  It is untrue that Liberty denied the claim without any investigation or inspection of the premises. Furthermore, Liberty had no reason to consider or evaluate the "collapse" provision given the claim presented; thus, there was also no reason to evaluate whether the affected walls were the "foundation" and/or "retaining wall[s]."[12]

In its May 12, 2014 denial letter, Liberty explicitly stated that its position was premised upon its "investigation" and "presently known facts."  Ex. I, p. 2. It encouraged the plaintiff to present additional information.  Ex. I, p. 2.

These so-called "concrete decay" claims brought by Attorney Parker's office always feature the same attorneys, engineer (Mr. Grandpre), and home builder (Mr. Soucy).  This suit was filed on August 8, 2014.  All of these individuals were involved in this claim prior to that date.  Ex. G, p. 75, Ex. F, pp. 12-14.

---

[12] This Court has consistently found Liberty's interpretation of the terms "foundation" and "retaining wall" to be reasonable, including in its order denying Liberty's motion to dismiss in this matter.

Nevertheless, despite this superior knowledge of what their actual claim was prior to suit, the plaintiffs never informed Liberty of similar claims in the Tolland County area or in the vicinity of their property.   They never mentioned Mottes concrete.   The plaintiffs never presented this "collapse" coverage theory. They did not mention that Attorney Parker had tried a case with substantially identical allegations to successful verdict in *Bacewicz*.   Instead of providing Liberty with all pertinent information, the plaintiffs initiated suit based upon a claim which they never presented.   As such, it appears that the plaintiffs intentionally obscured their actual claim so that they could "up the ante" in litigation with baseless extra-contractual allegations.

Courts in Connecticut are well-aware of this frequent and unfortunate practice in first-party actions:

> "…[F]irst-party actions against insurers…are increasingly accompanied by bad faith claims and CUTPA/CUIPA actions.  Not infrequently, these additional claims are themselves brought in bad faith, to 'up the ante' at pretrial and trial by increasing the insurer's exposure; to exponentially increase the scope of discovery, with the hope of obtaining the insurer's entire file, including its work-product investigation; and for purposes of trial strategy.  In such case, the prejudice to the defendant is evident."
>
> *Khanthavong v. Allstate Ins. Co.*, 1996 WL 704366 (Conn. Super 1996).

Moreover, the plaintiffs do not know which insurer is liable under their collapse theory, as demonstrated by their inclusion of Allstate in this lawsuit for

the same claimed loss.  The plaintiffs cannot credibly allege that Liberty acted in bad faith in denying their claim when they are unsure which insurer, if any,  is liable for covering it.

Based on all of the above, Liberty respectfully requests that summary judgment enter in in its favor as to Count II.

D.  <u>Liberty is entitled to summary judgment on the CUTPA/CUIPA counts</u>:

The plaintiffs' CUTPA/CUIPA counts are similarly meritless for all of the reasons detailed in the preceding subsection concerning the bad faith count.  At the outset, the defendant notes that with respect to insurance claims, a private right of action pursuant to CUTPA exists only in the context of a violation of CUIPA.  *State v. Acordia, Inc.*, 310 Conn. 1, 37, 73 A.3d 711 (2013).

In order to prevail under CUTPA/CUIPA, the plaintiffs must plead and prove that Liberty engaged in a general business practice of unfair claims handling practices.  *Lees v. Middlesex Ins. Co.,* 229 Conn. 842, 847-49, 643 A.2d 1282 (1994).  Connecticut courts have rejected plaintiffs' attempts to establish a "general business practice" by string-citing other cases that include bad faith allegations. *See Ferrante v. Allstate Prop. & Cas. Ins. Co.*, 2011 WL 3890988, at *2 (Conn. Super. 2011)("The plaintiff's string citation merely stands for the proposition that the defendant has been sued for bad faith settlement practices. Without more, this represents only a legal conclusion and does not constitute

proper fact pleading . . .")  Indeed, the plaintiffs' string citation in ¶ 50 of the amended complaint merely stands for the proposition that their attorneys frequently advance baseless extra-contractual counts against insurers.  *See also*, *Charter Oak Fire Ins. v. Blue Sky Part.*, 2001 WL 1178318 (Conn. Super. 2001)(motion to strike granted where allegations of general business practice were based on three pending lawsuits); *Ellison v. Great Am. Spirit Ins. Co.*, 2006 WL 3491242 (Conn. Super. 2006)("Merely alleging that other lawsuits have been filed against the defendants is insufficient."); *Rams II, LLC v. Mass. Bay Ins. Co.*, 2015 WL 3554789 (Conn. Super. 2015)("Citations to other cases in a cause of action attempting to plead a general business practice in violation of CUIPA are proper only if the decision maker in those cases found the defendant to be in violation of CUIPA.").

The plaintiffs have failed to reference a single matter in which a decision maker found Liberty to be in violation of CUIPA.  Furthermore, the CUTPA/CUIPA counts detail their lack of understanding of the Insurance Service Office, Inc. ("ISO") and its relationship with Liberty. Liberty did not have knowledge of *Bacewicz* during its claim evaluation.  This is confirmed by the lack of any mention of  *Bacewicz* in the claim notes.  Ex. D.  There is also no mention of any other similar claims in the claim notes Ex. D.  The denial letter and the absence

of references to other claims establishes that Liberty evaluated this claim on its own merits and without consideration given to any other claim. Ex. D and Ex. I.

Moreover, the plaintiffs' allegation in ¶ 42 of the amended complaint that Liberty obtained knowledge from ISO of other insurers' attempts to deny coverage in these self-termed "concrete decay" claims is similarly unfounded. The listed excluded causes in that paragraph are common policy exclusions that no insurer would have to rely upon ISO to provide.  There is no evidence that any information was provided by ISO in relation to this claim.  Moreover, Mr. Soucy has testified that foundation walls break for a number of reasons. Ex. N, pp. 47 and 71.  His testimony supports Liberty's contention that there was no reason to link this claim to any other claim.  Liberty's policies utilize ISO forms.[13]  ISO does not provide it with information about "concrete decay" claims or the prevalence of them in northeastern Connecticut.

As noted above, Liberty had no reason to link this case to its claims handling decisions in the other matters cited in the amended complaint.  The plaintiffs have no evidence that other claims were considered or relied upon by

---

[13] "Insurance Services Office, Inc., an association of approximately 1400 domestic property and casualty insurers …is the almost exclusive source of support services in this country for…insurance.  [ISO] develops standard policy forms and files or lodges them with each [s]tate's insurance regulators; most…insurance written in the United States is written on these forms." *Capstone*, 308 Conn. at n. 6.

Liberty during its claim evaluation.  All they have to support their CUTPA/CUIPA claim is that their attorneys have brought multiple substantially identical lawsuits relatively contemporaneously.

The plaintiffs' CUTPA/CUIPA claim is premised solely on the alleged unfair denial of coverage for the plaintiffs' "collapse" claim.  Thus, there can be no violation of CUTPA/CUIPA unless it is first established that both the underlying claim is covered and was presented to the insurer.  Since the underlying "collapse" claim is not covered and was never presented to Liberty during the claims process, the denial of coverage based upon the claim made is not a violation of CUTPA/CUIPA.

The plaintiffs have failed to establish any general business practice, yet alone one of denying claims in which liability is reasonably clear.  Their inclusion of Allstate in this lawsuit for the same claimed loss is a tacit admission that it is not even clear to them which insurer, if any, should cover their claim.

III.    <u>CONCLUSION</u>:

For the foregoing reasons, it is respectfully requested that the motion for summary judgment be granted as to all counts.

32

DEFENDANT,
LIBERTY MUTUAL FIRE INSURANCE
COMPANY


By__/s/ Kieran W. Leary_____
    Philip T. Newbury, Jr. (ct05283)
    Kieran W. Leary (ct29484)
    Howd & Ludorf, LLC
    65 Wethersfield Avenue
    Hartford, CT  06114
    (860) 249-1361
    (860) 249-7665 (Fax)
    E-Mail:  pnewbury@hl-law.com
    E-Mail:  kleary@hl-law.com

## CERTIFICATION

This is to certify that on July 1, 2016, a copy of the foregoing Memorandum of Law in Support of Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Michael D. Parker, Esq.
Jeffrey R. Lindequist, Esq.
Law Office of Michael D. Parker
One Monarch Place, Suite 2200
Springfield, MA  01144-2220
413 736-4101
413 736-4582 fax
mparker@mdparkerlaw.com
jlindequist@mdparkerlaw.com

Raymond T. DeMeo, Esq.
Jessica A.R. Hamilton, Esq.
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
Phone: 860-275-8200
Fax: 860-275-8299
rdemeo@rc.com
jhamilton@rc.com

_____/s/ Kieran W. Leary_____
Kieran W. Leary

34