**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **STEPHEN A. METSACK AND** | : | **CIVIL ACTION NO.** |
| **GAIL D. METSACK,** | : | **3:14-CV-01150 (VLB)** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LIBERTY MUTUAL FIRE INSURANCE** | : | |
| **COMPANY AND ALLSTATE INSURANCE** | : | |
| **COMPANY,** | : | |
| **Defendants.** | : | **February 21, 2017** |

**MEMORANDUM OF DECISION DENYING LIBERTY MUTUAL'S MOTION FOR
SUMMARY JUDGMENT [DKT. 59] AND GRANTING ALLSTATE'S MOTION FOR
SUMMARY JUDGMENT [DKT. 65]**

**I.      Introduction**

        This action arises out of an insurance dispute between the Plaintiffs,

Stephen A. Metsack and Gail D. Metsack (the "Metsacks") and Defendants Liberty

Mutual Fire Insurance Company ("Liberty Mutual"), and Allstate Insurance

Company ("Allstate").  The Metsacks allege breach of contract, breach of the

implied covenant of good faith and fair dealing, and violations of the Connecticut

Unfair Insurance Practices Act ("CUIPA") and Unfair Trade Practices Act

("CUTPA"), stemming from Defendants' decision to decline coverage for damage

to the basement walls of Plaintiffs' home under their homeowners insurance

policies (the "Policies").  Liberty Mutual and Allstate separately have moved for

summary judgment with respect to these claims.  For the reasons that follow,

Liberty Mutual's Motion for Summary Judgment [Dkt. 59] is DENIED, and

Allstate's Motion for Summary Judgment [Dkt. 65] is GRANTED.

II.    <u>Factual Background</u>

The Metsacks have lived at 148 Laurel Lane, Ashford, Connecticut ("the Property") since 1992.  [Dkt. 30 ("Compl.") ¶¶ 5-6].  The Property was insured by Allstate under separate policies of insurance, each with one-year terms, beginning on June 27, 1991 and ending on September 9, 2009 [Compl. ¶ 55; Dkt. 67-9 ("P. Torres Aff.") ¶ 3].  From September 2009 until the present, Plaintiffs have been insured by Liberty Mutual.  [Compl. ¶ 6].  Mr. Metsack acted as his own general contractor when the house was originally constructed in 1992.  [Dkt. 74-1 (S. Metsack Dep. at 13].  The concrete used to construct the basement walls of the home was supplied by the JJ Mottes Company.  [S. Metsack Dep. at 71; Dkt. 74-3 ("G. Metsack Dep.") at 4-5].

In the years following the home's construction, the Metsacks noticed what they believed to be "minor cracking" in the basement walls.  [S. Metsack Dep. at 75-76; G. Metsack Dep. at 19; Dkt. 74-4 at 10-11].  Stephen Metsack recalled first noticing this cracking prior to 2008, but Gail Metsack did not recall observing cracking prior to 2009.  [S. Metsack Dep. at 47; G. Metsack Dep. at 11-12].  Despite noticing minor cracking, the Metsacks perceived no problems with the basement walls of their home until April of 2014, when a friend observed exterior cracking and suggested that the Metsacks speak with a contractor about it.  *Id.*  This contactor inspected the property and suggested for the first time that the cracks might be associated with defective concrete.  [S. Metsack Dep. at 78].  On April 15, 2014, the Metsacks noticed water infiltrating the basement for the first time since the home was constructed, leading them to believe that their basement

walls were in fact affected by defective concrete.  [S. Metsack Dep. at 84-87; G. Metsack Dep. at 19; Dkt 74-4 at 10-11].

The Metsacks, Liberty Mutual, and Allstate each retained experts to investigate the causes of the cracking in the Metsacks' basement walls.  All agree that a chemical reaction involving the oxidation of iron sulfide materials in defective concrete provided by the JJ Mottes Company caused the concrete to expand and crack.  The Metsacks' expert, David Grandpré, P.E., opined in an October 30, 2015 report that "the severity of deterioration of the concrete basement walls compromised the[ir] structural integrity and will continue to weaken until they are no longer competent to perform their intended function of supporting the weight of the floors, walls, and roof."  [Dkt. 67-5, Exh. A at 4].  He further stated that "the concrete walls can no longer be relied on to continue to perform their intended function of resisting the lateral pressures exerted on them by soil and water in the ground and for supporting the vertical loads of the wood-framed house."  *Id.*  Grandpré conceded that the house was "still safe to live in," but that because the basement walls cannot be counted on to continue to support the weight of the rest of the house in the future, they were substantially impaired. [Dkt. 74-6 ("Grandpré Dep." at 50-51].  He also stated that the point of substantial impairment is when horizontal cracks begin to appear in the concrete, which typically occurs between ten and eighteen years after the concrete is poured. [Grandpre Dep. at 54-55, 100-103].

A.  **Liberty Mutual Claim**

On April 18, 2014, the Metsacks submitted a claim to Liberty Mutual, which mentioned water infiltration, but did not inform Liberty that they had spoken to a contractor about their basement walls or that the concrete in the basement walls was supplied by JJ Mottes.  [G. Metsack Dep. at 58-59].  On April 25, 2014, Liberty Mutual sent an independent adjuster to inspect the Property.  [Dkt. 61-8].  The adjuster's report noted cracks in all four basement walls, some as wide as a quarter of an inch, and possible structural displacement.  *Id.*  As possible causes of the damage, the adjuster listed "hydrostatic pressure, improper concrete mix, [and] freeze thaw," and she recommended consulting an engineer to determine whether the damage was structural.  *Id.*  Liberty Mutual did not consult an engineer, and by letter dated May 12, 2014, denied the Metsacks' claim on the grounds that the damage was caused by "settling/earth movement and ground water intrusion."  [Dkt. 61-9].

The Liberty Mutual Policy provides coverage under Section 8 of the Policy for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following . . . (b) Hidden decay . . . or (f) Use of defective material or methods in construction, remodeling or renovation."  [Dkt. 30-1 ¶ 8].  The Liberty Mutual Policy does not include a definition for "collapse," but excludes loss to a "foundation . . . unless the loss is a direct result of the collapse of a building," and excludes "settling, cracking, shrinking, bulging or expansion."  *Id.*

4

The Metsacks identify numerous lawsuits against Liberty Mutual or its affiliates that involve the denial of coverage for losses resulting from defective JJ Mottes Company concrete.  [*See* Dkt. 72 ¶¶ 23-26].[1]  They also submit five denial of coverage letters from Liberty Mutual and related entities from the Liberty Mutual Group.  The letters date from September 2012 to August 2015, and blame the basement wall cracking reported on "settling or earth movement" (August 11, 2015), "settling, expansion" (September 19, 2012), "long term moisture infiltration" and "original construction methods" (April 21, 2015), "faulty construction" (January 10, 2013), and "faulty workmanship or materials" (October 15, 2014).  [Dkt. 72-9].

B.  Allstate Claim

The Metsacks notified Allstate of the condition of their walls and submitted an insurance claim on March 3, 2015.  [Compl. ¶¶ 66; Dkt. 67-8 "Erskine Aff." ¶¶ 4-

---

[1] They list *Karas v. Liberty Ins. Corp.*, No. 3:13-cv-1836 (SRU) (D. Conn.); *Belz v. Peerless Ins. Co.*, No 3:13-cv-1315 (JCH) (D. Conn.); *Roberts v. Liberty Mut. Fire Ins. Co.*, No. 3:13-cv-435 (SRU) (D. Conn.); *Matthews v. Peerless Ins. Co.*, No. 3:12-cv-1506 (WWE) (D. Conn.); *Waters v. Liberty Mutual Group, Inc.*, No. 06-131 (Mass. Sup. Ct.)]; *Celentano v. Liberty Mut. Fire Ins. Co.*, No. TTD-CV-15-6009018-S (Conn. Sup. Ct.); *Constantino v. Liberty Mut. Fire Ins. Co.*, No. TTD-CV-16-6010670-S (Conn. Sup. Ct.); *Gabriel v. Liberty Mut. Fire Ins. Co.*, No. 3:14-CV-01435 (SRU) (D. Conn.); *Jang v. Liberty Mut. Fire Ins. Co.*, No. 3:15-CV-01243 (JBA) (D. Conn.); *Mensher v. Liberty Mut. Fire Ins. Co.*, 3:15-CV-01007 (WWE) (D. Conn.); *Metsack v. Liberty Mut. Fire Ins. Co.*, No. 3:14-cv-01150 (VLB) (D. Conn.); *Roy v. Liberty Mut. Fire Ins. Co.*, No. TTD-CV-15-6009410-S (Conn. Sup. Ct.); *Wojtyna v. Liberty Mut. Fire Ins. Co.*, No. TTD-CV-16-6010342-S (Conn. Sup. Ct.); *Dino v. Safeco Ins. Co. of America*, No. TTD-CV-16-6010428-S (Conn. Sup. Ct.); *Jenkins v. Liberty Ins. Corp.*, No. 3:16-cv-00090 (AVC) (D. Conn.); *Kowalyshyn v. Excelsior Ins. Co.*, No. 3:16-cv-00148 (JAM) (D. Conn.); *Piacentini v. Kemper Independence Ins. Co.*, No. TTD-CV-16-6010341-S (Conn. Sup. Ct.); *Soderburg v. Peerless Indemnity Ins. Co.*, No. TTD-CV-16- 6010893-S (Conn. Sup. Ct.); *Willenborg v. Unitrin Preferred Ins. Co.*, No. TTD-CV-16-6010936-S (Conn. Sup. Ct.).

5].  Plaintiffs state that they had attempted to notify Allstate earlier by way of their independent agent, who refused to submit the claim on their behalf.  [G. Metsack Dep. at 15-18].  The claim referenced the April 15, 2014 water intrusion and the fact that while the Metsacks no longer had an active policy with Allstate, the loss may have occurred during the time that Allstate covered the property.  [G. Metsack Dep. at 21-22, 25-26].  Allstate orally denied the claim on March 10, 2015, and sent the Metsacks a letter dated March 27, 2015 memorializing the denial.  [G. Metsack Dep. at 26-27; Dkt. 74-5 ¶ 3].

The Metsacks were insured under two separate Allstate policies:  one covering the period between 1991 and 1994 ("First Allstate Policy"), and a second covering the period between 1994 and 2009 ("Second Allstate Policy") (collectively, "Allstate Policies").  [Torres Aff., Exh. 1 at 4, Exh. 2 at 3; Exh. 3 at 15].  The Allstate Policies cover "the entire collapse of a covered building structure" and the "entire collapse of part of a building structure," so long as the collapse is "a sudden and accidental direct physical loss caused by . . . hidden decay of the building structure" or "defective methods or materials used in construction, repair, remodeling or renovation."  [Dkt. 30-3 at 15].  The Allstate Policy does not contain a specific definition for "collapse," but defines "building structure" as "a structure with walls and a roof."  *Id.* at 3.  Like the Liberty Mutual Policy, the Allstate Policies exclude "settling, cracking, shrinking, bulging or expansion."  *Id.*

The Metsacks also offer evidence that other than the claim advanced in the instant lawsuit, Allstate has encountered and denied at least eight separate

claims for coverage with respect to homes constructed with concrete supplied by

the JJ Mottes Company.  [Dkt. 74 ¶ 53].[2]  Plaintiffs offer two letters they claim

deny coverage on the ground that the insured failed to provide prompt notice

[Dkt. 74 ¶ 54].[3]  The denial letters state that the basement wall cracking was

examined by the structural engineer Leonard Morse-Fortier.  *Valls v. Allstate*

*Insurance Co.*, Dkt. 24-5, No. 3:16-cv-1310 (VAB) ("Valls Letter"); *Carney v.*

*Allstate Insurance Co.*, Dkt. 30-2, No. 3:16-cv-592 (VLB) ("Carney Letter").  The

Valls Letter suggested that the loss "may not have occurred during the Allstate

policy term," and stated that coverage would be denied on the grounds that the

cracking was not a "sudden and accidental direct physical loss," and that the

cracking was not an "entire collapse" because the "house remains occupied, the

foundation walls appear plumb, there is very little visible damage to the walls

themselves, the walls support the house structure above, and the walls retain the

soil that surrounds the house."  *Id.* at 3-4.   The Carney Letter similarly stated that

the cracking was not a "sudden and accidental direct physical loss," adding that

---

[2] Plaintiffs cite *Carlson v. Allstate Ins. Co.*, No. 3:15-cv-1045 (MPS) (D. Conn.);
*Lees v. Allstate Ins. Co.*, No. 3:15-cv-1050 (VAB) (D. Conn.); *Carney v. Allstate Ins.*
*Co.*, No. 3:16-cv-592 (VLB) (D. Conn.); *Lajeunesse v. Allstate Ins. Co.*, No. 3:16-cv-
937 (AVC) (D. Conn.); *Manseau v. Allstate Ins. Co.*, No. 3:16-cv-1231 (MPS) (D.
Conn.); *Valls v. Allstate Ins. Co.*, No. 3:16-cv-1310 (VAB) (D. Conn.); *Pearse v.*
*Allstate Ins. Co.*, No. 3:16-cv-1337 (SRU) (D. Conn.); *Adams v. Allstate Ins. Co.*,
No. 3:16-cv-1337 (JBA) (D. Conn.)].
[3] Plaintiff failed to submit these letters on the record, apparently accidentally.
[*See* Dkt. 74-5].  The letters are publicly available as part of the record in *Valls v.*
*Allstate Insurance Co.*, Dkt. 24-5, No. 3:16-cv-1310 (VAB) and *Carney v. Allstate*
*Insurance Co.*, Dkt. 30-2, No. 3:16-cv-592 (VLB).  Defendants discussed the
content of these letters in their briefing, suggesting that they were unaware that
the letters were not filed on the docket in this case.  Any objections to the Court
considering the versions of the letters docketed in *Valls* and *Carney* should be
raised within seven days of the date of this Order.

"Allstate does not know how long you have known about cracking in your foundational concrete.  However, the loss in question is one that has occurred over time and may have been evident for an extended period."  *Id.* at 4.

### III.   Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the

summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

IV.   <u>Discussion</u>

A. <u>Breach of Contract</u>

Plaintiffs argue first that Liberty Mutual and Allstate are liable for breach of contract, because they failed to cover losses as set forth in the Policies.  An insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372–73 (2008).  Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7–8 (2011) (quoting Remillard v. Remillard, 297 Conn. 345, 355 (2010)); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the

contract, taking into consideration the circumstances of the parties and the transaction." (quotations omitted)).

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe*, 300 Conn. at 260 (quoting *Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 734–35 (2005)). A contract is unambiguous when "its language is clear and conveys a definite and precise intent . . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.*

Where the language of an insurance policy is ambiguous, such language must be construed against the insurance company that drafted the policy. *See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 806 (1999). However, any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other provisions ... and every provision must be given effect if it is possible to do so . . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Harbour Pointe*, 300 Conn. at 261 (quoting *Cantonbury Heights*, 273 Conn. at 735).

### 1. Liberty Mutual

Liberty Mutual raises three primary arguments in support of its position that the damage to the Metsacks' basement walls is not a covered loss.  First, Liberty Mutual argues that the damage to the Metsacks' basement walls does not constitute a collapse under the terms of the policy, because Liberty Mutual's "collapse" provision excludes coverage for loss to a foundation or retaining wall unless the loss is a direct result of the collapse of the building.  Second, Liberty Mutual argues that Connecticut law has not provided sufficient guidance regarding the meaning of "collapse" and asks the Court to certify that question to the Connecticut Supreme Court before issuing its summary judgment ruling.  As a corollary, Liberty Mutual suggests that the damage to the Metsacks' basement walls is not extensive enough to constitute a "collapse" under the terms of the Liberty Mutual Policy.  Third, it argues that the claimed substantial impairment of the Metsacks' basement walls did not occur during a Liberty Mutual policy period. The Court finds each of these arguments unpersuasive.

### a.  "Foundation" and "Retaining Wall" Exclusions

The facts presented in the instant case with respect to Liberty Mutual are substantially equivalent to those presented in *Belz v. Peerless Ins. Co.*, No. 3:13-CV-01315 (VAB), 2016 WL 4599892 (D. Conn. Sept. 2, 2016), *reconsideration denied*, 2016 WL 6542828 (D. Conn. Nov. 3, 2016).  In *Belz*, the plaintiffs also alleged breach of contract for failure to cover losses caused by deteriorating JJ Mottes Company concrete.  *Id.* at *2.  The relevant policy provisions in the *Belz* case are identical to the relevant provisions of the Metsaks' Liberty Mutual policy. *Id.*  Additionally, the plaintiffs in both cases believed the cracks to be cosmetic

when they first appeared.  *Id.* at *1.  Finally, the same engineering expert determined that the plaintiffs' basement walls were substantially structurally impaired, such that the walls would need to be replaced to prevent the home from completely collapsing in the future.  *Id.* at *2.

The similarities are not limited to the facts of each case, but also to the defendants' arguments.  As in this case, Peerless argued that the terms "foundation" and "retaining wall" are unambiguous and include basement walls, justifying the denial of coverage for basement walls under an exclusion in the "collapse" provision of the policy.  *Id.* at *4.  Liberty Mutual and Peerless raised this argument at both the motion to dismiss and the summary judgment stages of their respective cases, and as in *Belz*, this Court has already rejected their argument at the motion to dismiss stage.  *See id.* (rejecting the argument that "foundation" and "retaining wall" are unambiguous, and stating that "the ambiguity of the contract terms at issue in this case has already been determined by this Court in a previous ruling on this matter"); *Metsack v. Liberty Mut. Fire Ins. Co.*, No. 3:14-CV-01150 (VLB), 2015 WL 5797016, at *7-8 (D. Conn. Sept. 30, 2015) (finding the terms "foundation" and "retaining wall" ambiguous, and observing that "[t]he arguments raised by Liberty Mutual here have been persuasively rejected three times by courts in this District").

The law-of-the-case doctrine states that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."  *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009).  Reconsideration of an earlier decision may be justified in "compelling

circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *Id.* None of these conditions is present here. As at the motion to dismiss stage, this Court noted that other courts in this District had found "foundation" and "retaining wall" ambiguous. *Metsack*, 2015 WL 579016 , at *7-8. Since then, more decisions within this District have reaffirmed this position. *See, e.g., Belz*, 2016 WL 4599892, at *4; *Gabriel v. Liberty Mut. Fire Ins. Co.*, No. 3:14-CV-01435-VAB, 2015 WL 5684063, at *4 (D. Conn. Sept. 28, 2015). Liberty Mutual has similarly failed to present any new evidence that would compel a new interpretation or that the Court's prior decision was clear error. Because this Court must rely on its prior ruling to guide its analysis on summary judgment, the Court again holds that the terms "foundation" and "retaining wall," are ambiguous as used in the policy, and must be construed against Liberty Mutual.

### b.  The Definition of Collapse

Like Peerless, Liberty Mutual believes that the definition of "collapse" set forth in *Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246, 253, 532 A.2d 1297 (1987)—a "substantial impairment to structural integrity"—is itself insufficiently defined, and asks the Court to certify a question to the Connecticut Supreme Court to resolve the resulting ambiguity. [Dkt. 60 at 23]. Liberty Mutual further argues that Connecticut should define "substantial impairment" so that it is consistent with the definition set forth in *Queen Ann Park Homeowners Ass'n v. State Farm Fire and Cas. Co.*, 352 P.3d 790, 791 (Wash. 2015). In *Belz*, the court

13

rejected this argument, stating unequivocally that, "The Court finds no reason to adopt Washington state law when the standard in Connecticut is relatively clear, nor is there a need for certifying this issue to the Connecticut Supreme Court." *Belz*, 2016 WL 4599892, at *5.  This Court sees no reason to deviate from this approach.

In *Queen Ann*, the Washington Supreme Court held that a "collapse" in the insurance context was a "substantial impairment to the structural integrity of a building or part of a building that renders such building or part of a building unfit for its function or unsafe."  *Id.*  And it stated that the "substantial impairment" must be "so severe as to materially impair a building's ability to remain upright." *Id.* at 794.  By contrast, *Beach* held that a collapse could occur "even though no actual caving-in occurred and the structure was not rendered completely uninhabitable."  This conflicts with Liberty Mutual's argument that a "collapse" should render a building "unfit for its function or unsafe."  [Dkt. 60 at 23 (quoting *Queen Ann*, 352 P.3d at 791)].

Further, *Beach* supports finding certification inappropriate, because it treats the question of whether a house was "substantially impaired" as one of fact, not one of law.  *See Beach*, 205 Conn. at 253 (stating that "the trial referee found, *as a matter of fact*, that the plaintiffs had proven such impairment of their house" (emphasis added)).  Consistent with this interpretation, the *Belz* court held that because the plaintiffs presented evidence that the cracks in their basement walls "compromised the structural integrity of their home," "there is a material dispute as to whether the damage amounts to a 'collapse' under the

Peerless policy.'" *Belz*, 2016 WL 4599892, at *5.  The same is true in this case—the Metsacks have offered evidence that the damage to their basement walls compromises the structural integrity of their home, and a material dispute exists regarding whether this damage is sufficiently "substantial" to constitute a "collapse" under the Liberty Mutual Policy's terms.

Liberty Mutual also asked the Court to certify "whether the undefined policy terms 'foundation' and 'retaining walls' are ambiguous" and "Whether a basement or crawlspace is part of the 'building.'"  [Dkt. 60 at 24].  Given the weight of case law in this District holding that "foundation" and "retaining walls" are ambiguous, *see* Section IV.A.1.a., *supra*, and the fact that Liberty Mutual offered no real argument regarding why it believes a crawlspace or basement is not part of a "building," the Court similarly declines to certify these questions of fact to the Connecticut Supreme Court.

### c.  Timeliness

Grandpré has acted as an engineering expert in several cases about defective JJ Mottes Company concrete.  In connection with two of these other cases, Grandpré calculated that substantial impairment to a home built in 1992 would occur somewhere between 2002 and 2006.  [Dkt. 60 at 21; Grandpré Dep. at 100-103].  Citing this testimony, Liberty Mutual concludes that summary judgment is warranted, because the Metsacks' home was not insured by Liberty Mutual until 2009.  However, Grandpré also testified that substantial impairment occurs when horizontal cracks appear in the basement walls, and Ms. Metsack testified that she did not notice cracks until 2009.  [Grandpré Dep. at 54-55; G. Metsack

Dep. at 11-12].  Viewed in the light most favorable to the Plaintiffs, a material issue of fact exists as to whether a covered collapse occurred before or during the period covered by the Liberty Mutual Policy.

### 1.  Allstate

Like Liberty Mutual, Allstate argues that "substantial impairment of structural integrity" should be defined as occurring where a structure is (1) "unfit for its function or unsafe"; or (2) "the structure is in imminent danger of falling down."  [Dkt. 66 at 18].  As set forth in Section IV.A.1.b., *supra*, the "unfit for its function or unsafe" standard is taken from a Washington case that is inconsistent with *Beach*'s holding that a home need not be "completely uninhabitable" to have "collapsed."  While the "imminent danger of falling down" language is taken directly from *Beach*, is not a part of the case's holding, and was not held to be a prerequisite for a "collapse."  In context, the relevant section reads:

> The [trial] court articulated its reasons as follows: 'It [the referee's report] was accepted because we found it to be sound, comprehensive and logical both factually and legally, including the recommendations:  (i) that a 'collapse' in the sense of a material impairment of the basic structure of a building was included within the coverage of the insurance policy involved in this action; and (ii) that the structure in question was in imminent danger of falling over, both of which are adopted by the undersigned.'"

*Beach*, 205 Conn. at 249.  The "imminent danger of falling down" language is quoted from the trial court's decision, and does not represent the Connecticut Supreme Court's own definition of "collapse."  *Id.*  Moreover, *Beach* states that the trial court's recommendations are logical "both factually and legally," suggesting that its conclusion about the structure's condition was factual, rather than legal.  The court reinforces this suggestion later in its decision, when it

states, "Having determined that the trial court was correct in its conclusion that ["collapse"] includes a substantial impairment of the structural integrity of a building, we need only note that the trial referee found, *as a matter of fact*, that the plaintiffs had proven such impairment of their house." *Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246, 253 (1987) (emphasis added). Because the question of whether damage to a home constitutes a "substantial impairment of the structural integrity of a building" is factual under Connecticut law, this Court cannot grant summary judgment.

Unlike Liberty Mutual, however, the "collapse" provision of the Allstate Policy requires that a covered collapse be "a sudden and accidental direct physical loss." [Dkt. 30-3 at 15]. While *Beach* and the numerous JJ Mottes concrete cases that have been heard in this district have held that a collapse need not be "sudden" to be covered, none of the policies evaluated included the word "sudden" within their "collapse" provisions. *See, e.g.*, *Belz*, 2016 WL 4599892, at *2; *Karas*, 33 F. Supp. 3d at 114; *Bacewicz v. NGM Ins. Co.*, No. 3:08-CV-1530 (JCH), 2010 WL 3023882, at *3 (D. Conn. Aug. 2, 2010); *Beach*, 205 Conn. 246, 251 (1987) ("Although 'collapse' encompasses a catastrophic breakdown, as the defendant argues, it also includes a breakdown or loss of structural strength, as the plaintiffs maintain. If the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended.").

Plaintiff cites *Dalton v. Harleysville Worcester Mut. Ins. Co.*, 557 F.3d 88, 92 (2d Cir. 2009) and *Kelly v. Balboa Ins. Co.*, 897 F. Supp. 2d 1262 (M.D. Fla. 2012) for the proposition that "sudden" in their policy is ambiguous, as each of these cases held that where collapse was caused by "hidden decay" or "hidden insect infestation," it could not occur suddenly.  However, the policy language at issue in *Dalton* did not qualify "collapse" with "sudden."  *Dalton*, 557 F.3d at 90.  While the collapse provision at issue *Kelly* is very similar to the collapse provision in the Allstate Policy, this Court does not agree that "the inclusion of [the term] 'sudden' in the definition of LOSS for a policy that covers insect damage creates an ambiguous policy provision," *Kelly*, 897 F. Supp. 2d at 1268.  "Hidden decay" and "hidden damage to the building structure caused by insects or vermin" can cause a collapse that an insured would perceive as "sudden," if the decay or infestation were truly hidden from the insured's view.

Because the parties do not dispute that the Metsacks' basement walls deteriorated over time, rather than "suddenly," and that the effects of the condition which has compromised the structure was observable to the homeowners many years before the basement walls were opined to be substantially impaired, the Allstate Policy excludes coverage for their loss irrespective of the definition of the term "collapse."  Summary judgment on the Breach of Contract claim with respect to Allstate is therefore GRANTED.  Because the Court finds that no material issue of fact precludes summary judgment that the Allstate Policy did not cover the Metsacks' claimed loss, summary judgment

on their bad faith and CUIPA/CUTPA claims with respect to Allstate must also be GRANTED.

### B. Breach of Covenant of Good Faith and Fair Dealing

Plaintiffs argue that in denying coverage for their claim, Liberty Mutual breached the implied covenant of good faith and fair dealing.  The duty of good faith and fair dealing "is a covenant implied into a contract or a contractual relationship," and every contract "carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement . . . ."  *Renaissance Mgmt. Co., Inc. v. Conn. Hous. Fin. Auth.*, 281 Conn. 227, 240 (Conn. 2007) (*quoting De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432–33 (Conn. 2004)).  "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."  *Id.*; *accord Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 795 (2013).  "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . [b]ad faith means more than mere negligence; it involves a dishonest purpose."  *De La Concha*, 269 Conn. at 433; *accord Capstone Bldg. Corp.*, 308 Conn. at 795; *TD Bank, N.A. v.. J & M Holdings, LLC*, 143 Conn. App. 340, 348 (Conn. App. Ct. 2013).

In the context of an insurance policy, "[a] bad faith action must allege denial of the receipt of an express benefit under the policy." *Capstone Bldg. Corp.*, 308 Conn. at 794.  Any cause of action for bad faith "not tied to duties under the insurance policy must therefore fail as a matter of law." *Id.* at 797. Because Plaintiffs have raised a material dispute regarding whether an express benefit exists under the Liberty Mutual Policy, the question becomes whether the record supports finding that Liberty Mutual acted with "actual or constructive fraud," a "design to mislead," or have acted with "neglect or refusal to fulfill" its duties. *See De La Concha*, 269 Conn. at 433.

In support of their claims, Plaintiffs argue that Liberty Mutual intentionally relied on inapplicable policy provisions to deny their claims, despite their knowledge that the damage may have been covered under the policy as a "collapse."  The Metsacks offer evidence that before they submitted their claim, Liberty Mutual had been a party to five separate lawsuits involving the same type of damage and the same policy language.  While none of these cases reached resolution following a full trial on the merits, several decisions on motions to dismiss had held that crumbling concrete basement walls could be covered as collapses.

There is also evidence that Liberty Mutual may have exercised bad faith in the investigation of the Metsacks' claim.  Although Liberty Mutual's independent adjuster identified "hydrostatic pressure," "freeze thaw," and "improper concrete mix" as causes of the cracking, [Dkt. 61-8], Liberty Mutual denied the Metsacks' claim as resulting from "settling/earth movement" and "ground water intrusion."

**20**

[Dkt. 61-9].  It is reasonable to conclude that "ground water intrusion" could be at the root of damage caused by "freeze thaw" or "hydrostatic pressure."  However, the adjuster's report lacks any reference to settling/earth movement, and the denial letter does not offer any basis for this conclusion other than a general claim that "a careful investigation" was conducted.  *Id.*  Moreover, a reasonable juror could conclude that Liberty Mutual acted in bad faith by failing to consult an engineer as recommended by its independent adjuster, especially knowing that the adjuster identified "improper concrete mix" as a possible cause of the structural impairment.  Viewed in the light most favorable to the Plaintiffs, these facts raise material issues of fact with respect to the Plaintiffs' bad faith claim.

### C.  CUIPA and CUTPA Claims

CUIPA does not provide a private right of action, but the Connecticut Supreme Court has recognized "the existence of a private cause of action under CUTPA to enforce alleged CUIPA violations."  *Mead v. Burns*, 199 Conn. 651, 663, 509 A.2d 11 (Conn. 1986).  However, "conduct by an insurance broker or insurance company that is related to the business of providing insurance can violate CUTPA only if it violates CUIPA," because "the legislative determinations as to unfair insurance practices embodied in CUIPA are the exclusive and comprehensive source of public policy in this area."  *State v. Acordia, Inc.*, 310 Conn. 1, 9-12, 73 A.3d 711 (Conn. 2013).

Section 38a–816 of CUIPA proscribes "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance," including "unfair claim settlement practices."  Conn. Gen. Stat. § 38a–816.  Plaintiffs claim

that the Defendants violated these unfair claim settlement practices provisions. *See* Conn. Gen.Stat. § 38a–816(6)(C) (failure "to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies"); Conn. Gen. Stat. § 38a–816(6)(D) (refusal "to pay claims without conducting a reasonable investigation based upon all available information"). Unfair claim settlement practices constitute a CUIPA violation when they are "[c]ommitt[ed] or perform[ed] with such frequency as to indicate a general business practice." Conn. Gen. Stat. § 38a–816(6).

In addition to offering evidence that Liberty Mutual did not sufficiently investigate their claim, Plaintiffs have offered evidence that Liberty Mutual and its affiliates have been involved in 19 separate lawsuits (including the instant case) involving the denial of claims arising from defective JJ Mottes concrete. Although most of these lawsuits post-date the Metsacks' claim, their existence, along with Plaintiffs' submission of five claim denial letters that deny coverage for homeowners experiencing the same damage under the same claim language, is sufficient to preclude summary judgment on this issue. *See Belz*, 2016 WL 4599892, at *9 (holding the defendant's refusal to cover similar claims in "three separate matters" could show that the defendant "has a general business practice of unfairly settling disputes" on summary judgment, where the defendant offered no alternative explanation for the proliferation of lawsuits)*.

The Court recognizes that the insurance policy language is ambiguous and that an insurer does not violate CUIPA by asserting a reasonable interpretation of its policy language. *See McCulloch v. Hartford Life & Acc. Ins. Co.*, 363 F. Supp.

2d 169, 177 (D. Conn. 2005).  However, Liberty Mutual's refusal to hire an engineer as its independent adjuster recommended and its reliance on reasons for its denial of coverage which were unsupported by its adjuster's report are sufficient to overcome summary judgment on this issue.

## V.   Conclusion

For the foregoing reasons, Liberty Mutual's Motion for Summary Judgment is DENIED, and Allstate's Motion for Summary Judgment is GRANTED.


IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: February 21, 2017